**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**SHERRY LOUISE STALNAKER,**

Plaintiff,

**v.**                                             **CIVIL ACTION NO.: 1:15-CV-160
(KEELEY)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,**

Defendant.

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On September 15, 2015, Plaintiff Sherry Louise Stalnaker ("Plaintiff"), through

counsel Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of

the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social

Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On

November 20, 2015, the Commissioner, through counsel Helen Campbell Altmeyer,

Assistant United States Attorney, filed an Answer and the Administrative Record of the

proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On December 18, 2015, and

January 14, 2016, Plaintiff and the Commissioner filed their respective Motions for

Summary Judgment and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF

No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14). On January 25, 2016,

Plaintiff filed a Response to Defendant's supporting brief. (Pl.'s Resp. to Def.'s Br. in

Supp. of her Mot. for Summ. J. ("Pl.'s Resp."), ECF No. 16). The matter is now before

the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. PROCEDURAL HISTORY

On August 15, 2011, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"). (R. 15, 151). Subsequently, on August 17, 2011, Plaintiff protectively filed a Title XVI claim for supplemental security income ("SSI") benefits. (R. 15, 159). In both applications, Plaintiff alleges disability that began on June 1, 2011.[1] (R. 15, 151, 159). Because Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2016, Plaintiff must establish disability on or before this date. (R. 15). Plaintiff's claim was initially denied on November 2, 2011, and denied again upon reconsideration on May 15, 2012. (R. 69, 92). After these denials, Plaintiff filed a written request for a hearing. (R. 106-07).

On October 25, 2013, a hearing was held before United States Administrative Law Judge ("ALJ") Karl Alexander in Morgantown, West Virginia. (R. 15, 41, 117). Plaintiff, represented by counsel Brian D. Bailey, Esq., appeared and testified at the hearing, as did Larry Ostrowski, an impartial vocational expert. (R. 15, 41, 58-63). On March 27, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 12). On August 5, 2015,

---

[1] Plaintiff filed her applications for DIB and SSI benefits under the name Sherry Louise Trickett. (R. 151). However, on November 3, 2011, Plaintiff changed the name in her applications to Sherry Louise Stalnaker. (R. 170).

the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III. BACKGROUND

### A. Personal History

Plaintiff was born on May 20, 1964, and was forty-seven years old at the time she filed her claims for DIB and SSI benefits. (See R. 189). She is 5'4" tall and weighs approximately 180 pounds. (R. 204). She is separated from her husband and lives alone in a house. (R. 213, 216). She completed school through the eleventh grade and has received training as a certified nursing assistant/home health aide/medical assistant. (R. 205). She has also received "beauty [school]" and "carpentry/electrical" training. (Id.). Her prior work experience includes working as a nursing assistant for a hospital, home health aide for two separate home health care agencies, health care worker for a nursing home and, most recently, correctional officer for a regional jail. (R. 192). She alleges that she is unable to work due to the follow ailments: (1) Graves' disease; (2) fibromyalgia; (3) degenerative disc disease; (4) hypertension; (5) chronic fatigue; (6) sciatic nerve; (7) depression; (8) diabetes mellitus; (9) acid reflux disease; (10) back and hip impairments and (11) vision impairments. (R. 204).

### B. Medical History

#### 1. Medical History Pre-Dating Alleged Onset Date of June 1, 2011

On October 21, 2009, Plaintiff presented to the office of Robert W. Powelson, O.D., a licensed optometrist, complaining of vision problems. (R. 265-66). During this visit, Plaintiff informed Dr. Powelson that she had damaged her eyeglasses. (R. 265). Dr. Powelson performed a comprehensive eye examination of Plaintiff and diagnosed

her with: (1) Grave's disease with ocular manifestations; (2) hyperopia in both eyes and (3) presbyopia in both eyes. (R. 266). To treat Plaintiff's vision problems, Dr. Powelson changed Plaintiff's eyeglass prescription and instructed Plaintiff to wear her eyeglasses at all times. (Id.).

On March 19, 2010, Plaintiff presented to Shelly P. Kafka, M.D., of Mountain State Rheumatology, for a rheumatological consultation after a referral from her primary care physician. (R. 509). During this consultation, Plaintiff informed Dr. Kafka that she had experienced "widespread pain in her body since 1997 and 1998." (Id.). Plaintiff further informed Dr. Kafka that she had been diagnosed with fibromyalgia. (See id.). After an examination, Dr. Kafka opined that Plaintiff's "laboratory tests do not seem consistent with connective tissue disease." (R. 512). Dr. Kafka further opined that Plaintiff "is already on a good [medication] regiment for fibromyalgia . . . [but that] physical therapy might be helpful." (Id.).

On June 21, 2010, Plaintiff presented to the Shinnston Healthcare Clinic for an appointment with Kristian M. Morrison, M.D., her primary care physician. (R. 410). Prior to this appointment, Dr. Morrison noted that, in previous years, he had diagnosed and treated Plaintiff for, *inter alia*: (1) Grave's disease, resolved status post radioactive iodine therapy; (2) hypothyroidism status post Grave's disease treatment; (3) gastroesophageal reflux disease ("GERD"); (4) Type II diabetes mellitus; (5) fibromyalgia; (7) degenerative joint disease; (6) chronic fatigue; (7) insomnia; (8) anxiety and (9) back pain. (R. 411). During the appointment, Dr. Morrison documented that Plaintiff was receiving workers' compensation benefits for an injury to her back and left hip that she had incurred at work in February of 2010, and that she had not yet returned

to work since the injury.[2] (R. 410). Dr. Morrison further documented that Plaintiff had participated in physical therapy sessions after her injury and was waiting to begin additional physical therapy sessions. (See R. 334, 410). Finally, Dr. Morrison documented that Plaintiff was prescribed Lortab, Opana, tizanidine, Klonopin and aspirin for the pain caused by her injury. (See id.).

On July 21, 2010, Plaintiff returned to Dr. Morrison's office for a follow-up appointment regarding her workers' compensation injury. (R. 408). During this appointment, Plaintiff stated that she had started her second round of physical therapy and that her pain "[was] under control [so] long as she [did not] do anything too strenuous." (Id.). Dr. Morrison then examined Plaintiff, noting "[d]ecreased [range of motion] in [Plaintiff's] left hip." (Id.). After the examination, Dr. Morrison listed degenerative joint disease, fibromyalgia and back pain as Plaintiff's active diagnoses. (R. 409).

On September 1, 2010, Plaintiff presented to the office of Mohamed Fahim, M.D., Ph.D., the Medical Director of the Pain Management Center at Davis Memorial Hospital, after being referred by Dr. Morrison. (R. 333). During this visit, Plaintiff informed Dr. Fahim that she "continues . . . to have pain" in her lower back and left hip despite her pain medication and physical therapy regimens. (R. 334). Dr. Fahim examined Plaintiff and diagnosed her with left sacroiliac joint dysfunction, left lumbar facet syndrome, left piriformis muscle syndrome and left trochanteric bursitis. (R. 333). To treat these conditions, Dr. Fahim prescribed Celebrex and scheduled Plaintiff for a steroid injection for her left sacroiliac joint. (Id.). Dr. Fahim also documented that he would "consider in

---

[2] On February 15, 2010, Plaintiff "sustained a thoracic and lumbar strain during the normal course of her employment [as a correctional officer] at a regional jail." (R. 508). Plaintiff's injury was caused from "[repeatedly] pulling a food cart." (R. 334, 508).

the future other injections, including [a] left piriformis muscle steroid injection," if Plaintiff's pain persisted. (Id.).

On September 17, 2010, Plaintiff presented to Dr. Morrison's office for another follow-up appointment regarding her workers' compensation injury. (R. 403). During an examination, Dr. Morrison noted the presence of back pain that had only minimally improved. (Id.). After examining Plaintiff, Dr. Morrison documented that Plaintiff "gets the most [pain relief] from using a TENs unit at [physical therapy]." (Id.). Therefore, Dr. Morrison prescribed a TENs unit for home use. (R. 404). However, James Dauphin, M.D., a Workers' Compensation Reviewing Medical Physician, later recommended that a TENs unit not be authorized. (R. 508). Dr. Dauphin opined that Plaintiff's work injury was not sufficiently severe to warrant a TENs unit and that Plaintiff would be using the TENs unit to treat the pain from her fibromyalgia as opposed to the pain from her work injury. (Id.).

Plaintiff returned to Dr. Morrison's office multiple times in the following months, resulting in Plaintiff undergoing various tests. On November 26, 2010, Dr. Morrison ordered X-rays of Plaintiff's left hip, as well as a total body scan. (R. 290-91). While the X-rays revealed no abnormalities, the total body scan revealed degenerative changes in Plaintiff's cervical spine, shoulders, elbows and left ankle. (R. 290-91). On November 27, 2010, Dr. Morrison ordered an MRI of Plaintiff's left knee, which showed "[q]uestion[able] early degenerative changes [in the] anterior-superior labrum [but o]therwise no significant abnormalit[ies]." (R. 289). Finally, on November 29, 2010, Dr. Morrison ordered that Plaintiff undergo a nerve conduction study, the results of which were normal. (R. 339).

On December 15, 2010, Dr. Morrison noted that Plaintiff "would like . . . to have a trial of going back to work." (R. 384). During this trial period, Plaintiff presented to Dr. Morrison's office every month. (See R. 368-84). On January 14, 2011, Dr. Morrison documented that Plaintiff "is back to work and feels better mentally[, although her] pain is about the same." (R. 384). On February 14, 2011, Dr. Morrison noted that Plaintiff "[is] doing well with work and seems to be able to do most of the things that she wants to do." (R. 380). However, on March 14, 2011, Dr. Morrison reported that Plaintiff had "a scuffle at work the other day" and that "her back has been hurting somewhat worse since that incident." (R. 378). To treat her increased pain, Dr. Morrison increased Plaintiff's Lortab prescription. (R. 379). On April 11, 2011, Dr. Morrison increased Plaintiff's Opana prescription due to continuing complaints of pain. (R. 373, 376). On May 5, 2011, Dr. Morrison documented that Plaintiff's "pain is significantly improved with the new pain [medication] regimen." (R. 368).

### 2.  Medical History Post-Dating Alleged Onset Date of June 1, 2011

On June 27, 2011, Plaintiff presented to the emergency room at United Hospital Center, stating that she had "injured [her] left hip walking up steps [at work] on [June 24, 2011]," and that she had been experiencing moderate hip pain since that time. (R. 277, 283, 358). After an examination, X-rays of Plaintiff's left hip were ordered, which were normal. (R. 271). Consequently, Plaintiff was diagnosed with a left hip contusion. (R. 273, 278-79, 281). Upon her discharge, Plaintiff was prescribed Motrin for her pain and provided with a written note for her employer, stating that she would be off work through June 29, 2011. (R. 279).

The following day, on June 28, 2011, Plaintiff presented to Dr. Morrison's office, complaining of severe left hip pain "deep within the hip joint." (R. 358). Dr. Morrison examined Plaintiff, noting left hip tenderness upon rotation and flexion. (Id.). After the examination, Dr. Morrison diagnosed Plaintiff with hip strain and ordered that Plaintiff begin physical therapy sessions. (R. 359). Dr. Morrison opined that Plaintiff "need[ed four] weeks of [physical therapy] before [she could] to return to work." (R. 353). However, on July 11, 2011, Dr. Morrison noted that "worker's comp has yet to approve [Plaintiff's] physical therapy, so she has not done it yet."[3] (Id.).

Plaintiff continued to present to Dr. Morrison's office for follow-up appointments over the next several months. (R. 348-49, 426-31, 478-82). On August 8, 2011, Dr. Morrison noted that Plaintiff had started treatment with a chiropractor for her back pain. (R. 348). On October 6, 2011, Dr. Morrison ordered that Plaintiff undergo blood work, the results of which revealed that Plaintiff's diabetes mellitus was well-controlled. (See R. 417, 426). On December 4, 2011, Dr. Morrison increased Plaintiff's prescription for Lasix, a diuretic, after noting that Plaintiff had gained five pounds and "[had] attribute[d] it to retained fluid." (R. 478-79).

On December 5, 2011, Plaintiff returned to Dr. Morrison's office, stating that she "[did] not feel as though she [was] able to walk well enough to [return to] her job." (R. 476). Plaintiff further stated that she was "considering looking into getting training for alternate employment." (Id.). After an examination, Dr. Morrison noted that Plaintiff continued to experience back and joint pain. (Id.). However, Dr. Morrison also noted that

---

[3] The record does not reflect whether Plaintiff ever received the recommended four weeks of physical therapy.

Plaintiff's "pain [was] unchanged" and that Plaintiff's pain medications remained "mostly effective." (Id.).

In early 2012, Plaintiff presented to Dr. Morrison's office for follow-up appointments approximately once a month. On January 5, 2012, Plaintiff complained that "she [remained] in a lot of pain." (R. 474). As a result, Dr. Morrison increased Plaintiff's Opana prescription, added Lyrica to Plaintiff's pain medication regimen and referred Plaintiff to a pain clinic. (R. 474-75). On February 6, 2012, Dr. Morrison noted that Plaintiff was "doing better since starting the Lyrica." (R. 472). On March 6, 2012, Dr. Morrison noted that Plaintiff was feeling well enough to "increas[e] her exercise." (R. 466). However, on April 5, 2012, Dr. Morrison documented that Plaintiff was "afraid that the Lyrica [was] affecting her vision." (R. 582). Subsequently, on May 5, 2012, Dr. Morrison documented that Plaintiff was experiencing blurry vision and that she intended to make an appointment with an optometrist in the near future. (R. 574). Dr. Morrison also documented that Plaintiff was experiencing worsening depression "secondary to not working and . . . to her pain level," although he noted that her "pain level [was] much better than what it ha[d] been." (Id.).

In May and June of 2012, Plaintiff complained of bilateral knee pain to Dr. Morrison. (See R. 598-99). Therefore, on May 11, 2012, Dr. Morrison ordered X-rays of Plaintiff's knees, which revealed no significant abnormalities. (Id.). After Plaintiff continued to complain of bilateral knee pain, Dr. Morrison ordered MRIs of Plaintiff's knees on June 4, 2012. (R. 596-97). The results of the MRI of Plaintiff's right knee showed a "[s]mall knee joint effusion . . . [and a q]uestion[able] strain injury [of the]

medial gastrocnemius muscle." (R. 596). The results of the MRI of Plaintiff's left knee were normal. (R. 597).

On July 2, 2012, Plaintiff presented to Dr. Morrison's office, complaining of back and neck pain and "some new symptoms that she believe[d were caused] by her chronic back and neck pain." (R. 558-59). After an examination, Dr. Morrison diagnosed Plaintiff with paresthesias/numbness and back pain. (R. 559). To treat Plaintiff's paresthesias/numbness, Dr. Morrison referred Plaintiff to the West Virginia University ("WVU") Department of Neurology. (Id.). To treat Plaintiff's back pain, Dr. Morrison continued Plaintiff's pain medication prescriptions but did not "increase the . . . dos[age] any further . . . [because Plaintiff was] already on a very large dose of pain medication." (Id.).

On August 1, 2012, Plaintiff presented to the WVU Department of Neurology for her referral appointment. (R. 592). During this appointment, Plaintiff complained of headaches that had started within the previous two months. (R. 594). Plaintiff described the pain from her headaches as sharp and stabbing in nature and stated that it was accompanied by a "'lightning bolt' like flash of light" across her field of vision. (Id.). Plaintiff was diagnosed with new onset headaches and hospitalized. (R. 592). After numerous tests revealed largely benign results, Plaintiff was discharged on August 7, 2012, with a new prescription of Elavil. (R. 592-93).

On August 31, 2012, Plaintiff returned to Dr. Morrison's office for a follow-up appointment regarding her headaches. (R. 541-42). During this appointment, Dr. Morrison noted that:

> [S]ince her admission to WVU[, Plaintiff] has had a lot of episodes of
> disorientation, she cant [sic] drive safely, she frequently forgets things and

> has a sensation of numbness going down her neck, she says that it seemed to start after her spinal tap, her head 'feels like it is the size of this room,' she is still having a lot of headaches, WVU tried to put her on [E]lavil but it made her too sleepy."

(R. 542). Despite these notes, Dr. Morrison documented that Plaintiff appeared alert and oriented throughout her appointment. (Id.). After an examination, Dr. Morrison diagnosed Plaintiff with malaise and fatigue. (Id.).

Plaintiff returned to Dr. Morrison's office several times in the subsequent months for follow-up appointments. On September 14, 2012, Dr. Morrison ordered that Plaintiff undergo a thyroid sonogram to monitor her Grave's disease. (R. 590-91). The results of the sonogram showed "no significant change[s]." (Id.). On October 1, 2012, Dr. Morrison documented that Plaintiff was "feel[ing] a lot better than she did at her last visit here" and that, while "her back still bothers her a lot, . . . her hip is feeling a lot better." (R. 533). Dr. Morrison further documented that Plaintiff had been "trying to cut down her pain [medications] per WVU neurology recommendations" and that she planned to wean herself off of her Opana prescription. (Id.).

After these follow-up appointments, Plaintiff did not return to Dr. Morrison's office again until 2013. (R. 516-24). On July 24, 2013, Dr. Morrison noted that Plaintiff had been "staying busy around the house and visiting with her grandchildren" and that, as a result, her back and neck "have been more stiff than usual." (R. 516-17). Dr. Morrison further noted that Plaintiff "has . . . been more anxious than usual." (R. 517). After an examination, Dr. Morrison increased Plaintiff's prescription of Klonopin. (R. 517, 522-23).

### 3. Medical Reports/Opinions

#### a. Psychiatric Review Technique by James W. Bartee, Ph.D., October 18, 2011

On October 18, 2011, James W. Bartee, Ph.D., a state agency psychological consultant, completed a Psychiatric Review Technique form on behalf of Plaintiff. (R. 441-54). When completing this form, Dr. Bartee initially noted that Plaintiff suffers from non-severe anxiety-related disorders. (R. 441). Dr. Bartee then analyzed the degree of Plaintiff's functional limitations. (R. 451). Specifically, Dr. Bartee rated Plaintiff's level of restriction in her activities of daily living as "mild." (Id.). Dr. Bartee also rated Plaintiff's levels of difficulty in maintaining social functioning and in maintaining concentration, persistence or pace as "mild." (Id.). Finally, Dr. Bartee rated Plaintiff's episodes of decompensation as "none." (Id.). On April 12, 2012, Joseph A. Shaver, Ph.D., performed a Case Analysis of Plaintiff's claim for DIB and SSI benefits and "affirmed as written" Dr. Bartee's Psychiatric Review Technique form. (R. 488).

#### b. Physical Residual Functional Capacity Assessment by A. Rafael Gomez, M.D., October 31, 2011

On October 31, 2011, A. Rafael Gomez, M.D., a state agency medical consultant, performed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff. (R. 455-62). In the sparsely completed report of this assessment, Dr. Gomez opined that Plaintiff's primary physical impairment constitutes a history of "Grave's disease [that is now] resolved." (R. 455). Dr. Gomez further opined that this physical impairment is non-severe in nature. (R. 462).

### c. Disability Determination Examination by Bennett Orvik, M.D., May 5, 2012

On May 5, 2012, Bennett Orvik, M.D., a state agency medical consultant, performed a Disability Determination Examination of Plaintiff. (R. 490-95). This Disability Determination Examination consisted of a clinical interview and a physical examination of Plaintiff. (See id.). During the clinical interview, Plaintiff informed Dr. Orvik that, in 2011, she had suffered an injury to her left leg and hip while working as a correctional officer at a regional jail and that she continues to have a "lot of problems related to that injury." (R. 490). She further informed Dr. Orvik that she suffers from fibromyalgia, degenerative disc disease, depression, hypertension and diabetes mellitus and that she has a history of Grave's disease. (R. 490-91). Finally, she informed Dr. Orvik that she takes multiple medications for pain, including Opana three times a day, Lyrica three times a day and Lortab up to five times a day. (R. 491).

After the clinical interview, Dr. Orvik performed a physical examination of Plaintiff. (R. 492-94). While this examination revealed mostly normal findings, Dr. Orvik noted several abnormal findings. (See id.). When summarizing these findings, Dr. Orvik stated that Plaintiff "had a significant positive straight leg raise test," which indicates that Plaintiff's low back pain may be caused by a herniated disk. (See R. 494).

After completing the Disability Determination Examination of Plaintiff, Dr. Orvik concluded that Plaintiff suffers from: (1) back pain with a history of degenerative disc disease; (2) treated/resolved Grave's disease; (3) fibromyalgia; (4) hypertension; (5) depression; (6) non-insulin dependent diabetes mellitus; (7) GERD and (8) osteoarthritis. (Id.). Dr. Orvik further concluded that Plaintiff's prognosis "does not appear to be very good" even though her "treatment [generally] appears to be

13

reasonably appropriate." (Id.). Regarding the activities that Plaintiff is able to perform despite her impairments, Dr. Orvik simply stated that Plaintiff "continues to claim that she has too much pain to be able to do much of anything at this time." (R. 495).

### d. Physical RFC Assessment, Fulvio Franyutti, M.D., May 7, 2012

On May 7, 2012, Fulvio Franyutti, M.D., a state agency medical consultant, performed a Physical RFC Assessment of Plaintiff.[4] (R. 499-06). During this assessment, Dr. Franyutti found that, while Plaintiff possesses no manipulative, visual or communicative limitations, she does possess exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Franyutti found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for a total of approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 500). Regarding Plaintiff's postural limitations, Dr. Franyutti found that Plaintiff is able to occasionally balance, climb ramps and stairs, stoop, kneel, crouch and crawl and is never able to climb ladders, ropes or scaffolds. (R. 501). Finally, regarding Plaintiff's environmental limitations, Dr. Franyutti found that Plaintiff must avoid concentrated exposure to extreme cold, extreme heat, vibrations, hazards and "[f]umes, odors, dusts, gases, poor ventilation, etc.," and need not avoid wetness, humidity or noise. (R. 503).

---

[4] On April 12, 2012, Dr. Franyutti performed a Case Analysis of Plaintiff's claim for DIB and SSI benefits. (R. 489). After completing the Case Analysis and reviewing Dr. Gomez's sparsely completed report of his Physical RFC Assessment, Dr. Franyutti declared that more information was needed regarding Plaintiff's gait, range of motion, strength, sensory responses and ability to use her hands for "gross [and] fine manipulations, etc." (Id.). Therefore, Dr. Franyutti performed his own Physical RFC Assessment of Plaintiff on May 7, 2012.

### e. Psychological Evaluation by Tony Goudy, Ph.D., August 12, 2013

On August 12, 2013, Tony Goudy, Ph.D., a state agency psychological consultant, performed a Psychological Evaluation of Plaintiff. (R. 601-06). This Psychological Evaluation consisted of a clinical interview, mental status examination and Beck Depression Inventory-II test ("BDI-II test"). (R. 601). During the clinical interview, Plaintiff stated that she is "the product of her mother being raped at the age of [fourteen]," with which she has not come to terms. (R. 605). Plaintiff further stated that she suffers from chronic depression that "has increasingly become worse over time." (R. 601-02). Finally, Plaintiff stated that she has never received formal mental health treatment. (R. 602).

During the mental status examination, Dr. Goudy documented various normal findings, including that Plaintiff was well-oriented to time, place, person and circumstance. (R. 603-04). However, Dr. Goudy also documented several abnormal findings, including that Plaintiff's intellectual functioning falls within "the low average to near borderline range." (R. 604). In addition to deficient intellectual functioning, Dr. Goudy documented that Plaintiff possesses "moderate to marked impairment" in recent memory and "marked impairment" in concentration. (R. 604-05).

After performing the mental status examination, Plaintiff participated in a BDI-II test, which is "designed to assess the degree of depressive symptomatology among adolescents and adults." (R. 604). Plaintiff received a score of fifty-five on this test, "indicating severe levels of depression." (Id.). Dr. Goudy noted that:

> [Plaintiff's] most severe symptoms include sadness, pessimism, feeling like a failure, loss of pleasure, guilt, feeling as though she is being punished, self criticalness [sic], loss of interest, feelings of worthlessness,

loss of energy, sleep disturbance, appetite disturbance, concentration problems, fatigue, and decreased libido.

(Id.).

After completing the Psychological Evaluation, Dr. Goudy reached several conclusions. First, Dr. Goudy concluded that Plaintiff suffers from "major depressive disorder, recurrent, severe." (R. 605). Second, Dr. Goudy concluded that Plaintiff suffers from functional limitations. (Id.). Specifically, Dr. Goudy concluded that Plaintiff suffers from: (1) "mild to moderate" restrictions in her activities of daily living; (2) "moderate" difficulty in maintaining social functioning; (3) "marked" difficulty in in maintaining concentration, persistence or pace and (4) no episodes of decompensation. (Id.). Third, regarding Plaintiff's ability to return to work, Dr. Goudy concluded that:

> It is believed that [Plaintiff] would have significant difficulty returning to work. Even without the stress of being in the workplace she suffers from crying episodes on a daily basis. In a controlled evaluation environment such as today she exhibited significant problems with concentration and memory, and those deficits would most likely be exacerbated by even a modicum of work stress.

(R. 605-06). Finally, Dr. Goudy concluded that Plaintiff's prognosis poor. (R. 606).

### f. Treating Source Statement by Kristian M. Morrison, M.D., October 30, 2012

On October 30, 2012, Kristian M. Morrison, M.D., Plaintiff's primary care physician, submitted a Treating Source Statement on Plaintiff's behalf. (R. 608). In this statement, Dr. Morrison declared that Plaintiff "is [his] patient and has been since 2009." (Id.). Dr. Morrison further declared that Plaintiff "suffers from multiple medical conditions that affect her ability to work," including severe fibromyalgia and lumbar disc disease. (Id.). Dr. Morrison opined that Plaintiff's fibromyalgia pain would "make[ ] it very difficult

for her to do any meaningful physical activity beyond her [activities of daily living]." (Id.).

Dr. Morrison also opined that, if Plaintiff were to work, her lumbar disc disease would

require her to change positions every thirty or forty minutes "to maintain a level of

comfort while working." (Id.). In conclusion, Dr. Morrison opined that "[Plaintiff] would

have significant difficulty and pain in trying to sustain meaningful employment." (Id.).

## C.     Testimonial Evidence

During the administrating hearing on October 25, 2013, Plaintiff detailed her work

history. (R. 49-50, 57). Most recently, Plaintiff was employed as a correctional officer at

the Tygart Valley Regional Jail, where she worked for nine years. (R. 49). Plaintiff

stopped working as a correctional officer in June of 2011 after she incurred an injury at

work when she "tripped going up the steps." (R. 49, 57). Prior to her job as a

correctional officer, Plaintiff worked as a home health aide for various employers. (R.

50).

Plaintiff testified that she suffers from physical impairments, including headaches,

Grave's disease, vision problems and fibromyalgia. (R. 51-57). Regarding her

headaches, Plaintiff states that they occur every day and can last a "couple hours,

sometimes all day." (R. 53). When a headache occurs, Plaintiff becomes "sensitive to . .

. light" and tries to stay in a dark room. (R. 54). To treat her headaches, Plaintiff takes

ibuprofen, which she describes as effective. (Id.). Regarding her Grave's disease, or

hyperthyroidism, Plaintiff states that the condition was treated with radioactive iodine.

(R. 53). As a result, Plaintiff now takes Synthroid, which is used to treat hypothyroidism.

(See id.). However, Plaintiff reports that she still suffers from symptoms of her Grave's

disease, including difficulty sleeping, feeling "tired all the time" and retaining fluid in her

legs and feet. (R. 52). Regarding her vision problems, Plaintiff explains that, at one time, Grave's disease had caused her eyes to protrude and for her to experience double vision. (R. 54). Consequently, Plaintiff underwent "at least six eye surgeries" related to her Grave's disease. (Id.). Her most recent eye surgery occurred in 2000. (Id.). Plaintiff's vision problems now primarily consist of complaints of blurry vision. (Id.).

Regarding her fibromyalgia, Plaintiff states that she was diagnosed with the condition in 1998. (R. 51). While she was able to work the "better part of [ten] or [twelve] years" with the condition, her work injury in June of 2011 "aggravated it." (R. 51-52). Plaintiff explains that her fibromyalgia causes her to "just hurt[ ] all over," particularly in her back, legs, elbows and hips. (R. 50-51, 57). She further explains that her fibromyalgia causes her severe pain and fatigue when doing "little things" around the house. (R. 56). Finally, she explains that she experiences hip and back pain when sitting, which requires her to prop her feet up or lay down to relieve the pain. (R. 51, 57).

In addition to physical impairments, Plaintiff testified that she suffers from mental impairments. (See R. 55-56). Without explicitly identifying these impairments, Plaintiff states that her mental symptoms include feeling sad and useless, a loss of interest in activities she used to enjoy and memory problems. (Id.). To illustrate her memory problems, Plaintiff states that she forgets to take her medication at times and will "[w]alk into a room [and] forget what [she] went in there for." (Id.). While Plaintiff has never received any "formal" psychological treatment, her primary care physician prescribes her Celexa for her mental impairments. (R. 55).

Finally, Plaintiff testified regarding her routine activities. On a typical day, Plaintiff awakens, takes her pain medication and eats breakfast. (R. 51). She then does "normal

little things" around the house, such as sweeping the floor, washing dishes or "run[ning] the swiffer." (R. 51, 56). Periodically throughout the day, Plaintiff sits on the couch and props her feet up or lays down. (R. 51, 57). She visits her grandchildren every two weeks. (R. 56).

## D.    Vocational Evidence

### 1.  Vocational Testimony

Larry Ostrowski, an impartial vocational expert, also testified during the administrative hearing. (R. 58-63). Initially, Mr. Ostrowski testified regarding the characteristics of Plaintiff's past relevant work. (R. 59). Regarding Plaintiff's most recent job as a corrections officer, Mr. Ostrowski characterized the position as a medium exertional, semi-skilled position. (Id.). Likewise, Mr. Ostrowski characterized Plaintiff's previous jobs as a nurse assistant and a home attendant as medium exertional, semi-skilled positions. (Id.).

After Mr. Ostrowski described Plaintiff's past relevant work, the ALJ presented several hypothetical questions for Mr. Ostrowski's consideration. In the first hypothetical question, the ALJ asked:

> [A]ssume a hypothetical individual of [Plaintiff's] age, educational background, and work history who would be able to perform a range of light work, could perform postural movements occasionally except should do minimal kneeling, crawling, [and] squatting, and no climbing of ladders, ropes or scaffolds. To the maximum extent possible, should walk on level and even surfaces, should have no concentrated exposure to temperature extremes, wet or humid conditions, or environmental pollutants, and no exposure to hazards. Should work in a low-stress environment with no production line or assembly-line type of pace, no independent decision-making responsibilities, and minimal changes in the daily work routine. Would be limited at this time to unskilled work involving only routine and repetitive instructions and tasks, and should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors.

Would there be any work in the regional or national economy that such a person could perform?

(R. 59-60). In response to the hypothetical, Mr. Ostrowski testified that such an individual could work as an office helper, marker and mail clerk for "a business[,] as opposed to . . . the Postal Service." (R. 60-61). The ALJ then repeated his question but changed the hypothetical individual's qualifications from being able to perform light exertional work to being able to perform only sedentary work. (R. 61). Mr. Ostrowski responded that such an individual could work as a surveillance system monitor, document preparer and ampoule sealer. (Id.). After the ALJ's hypothetical questions, Mr. Ostrowski declared that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Id.).

Plaintiff's counsel, Mr. Bailey, also presented questions for Mr. Ostrowski's consideration during the administrative hearing. (R. 62-63). First, Mr. Bailey asked if "any of the jobs [Mr. Ostrowski] named at the light . . . [and] sedentary [exertional] level[s], . . . allow for a person to elevate [his or] her legs for over [ten] percent of the work day." (R. 62). Mr. Ostrowski opined that the job positions he named "would [not] allow for that" because it would be considered being off task. (Id.). Second, Mr. Bailey asked how an individual's "taking [of] breaks outside of the typically scheduled breaks . . . [would] affect [an individual's] employment." (Id.). Mr. Ostrowski responded that employers would consider such an individual's actions as off task and that, if the "individual were off task more than [ten] percent [of the workday] on an ongoing basis, [the individual] would lose [his or her] job." (Id.). Finally, Mr. Bailey asked whether sitting in a dark room due to a headache would be considered being off task, to which Mr.

Ostrowski replied that "[i]t really doesn't matter why a person's off task[,] . . . just that they are." (R. 63).

### 2. Report of Contact Forms, Work History Reports & Disability Reports

On August 22, 2011, Plaintiff submitted a Work History Report. (R. 192-02). While this report was not fully completed, Plaintiff asserted that she has worked approximately five job positions in the past fifteen years. (R. 192). Specifically, Plaintiff asserted that she has worked as a nursing assistant for a hospital, home health aide/worker for two separate home health care agencies, health care worker for a nursing home and, most recently, correctional officer for a regional jail. (Id.).

Also on August 22, 2011, Plaintiff submitted a Disability Report. (R. 203-12). In this report, Plaintiff indicated that she is unable to work due to the following conditions: (1) Graves' disease; (2) fibromyalgia; (3) degenerative disc disease; (4) hypertension; (5) chronic fatigue; (6) sciatic nerve; (7) depression; (8) diabetes mellitus; (9) GERD; (10) back and hip impairments and (11) vision impairments. (R. 204). Plaintiff further indicated that she stopped working on June 1, 2011, "[b]ecause of [her] condition(s)." (Id.). Finally, Plaintiff indicated that she is prescribed the following medications for her conditions: aspirin, estradiol, hydrochlorothiazide, Lortab, ibuprofen, Klonopin, Lasix, Opana, potassium, ranitidine, Synthroid, tizanidine and a Vitamin D supplement. (R. 207).

After Plaintiff submitted her Disability Report, a "representative" of Plaintiff's completed two Disability Report-Appeal forms on her behalf. (R. 223-29, 244-51). On March 3, 2012, the representative updated Plaintiff's list of medications to include Lyrica

and epinephrine. (R. 227). Then, on July 5, 2012, the representative again updated

Plaintiff's list of medications to include Viibryd. (R. 248).

On May 9, 2012, Diane L. Snyder, from the Disability Determination Section

("DDS") office in Clarksburg, West Virginia, completed a Report of Contact form. (R.

243). On this form, Ms. Snyder initially reported that Plaintiff is capable of performing

light exertional work with postural limitations. (Id.). Ms. Snyder then reported that:

> A finding about the capacity for [past relevant work] has not been made.
> However, this information is not material because all potentially applicable
> medical-vocational guidelines would direct a finding of 'not disabled,' given
> [Plaintiff's] age, education, and RFC. Therefore, [Plaintiff] can adjust to
> other work.

(Id.). Finally, Ms. Snyder reported that Plaintiff is capable of working as a

cleaner/housekeeper, collator operator and photocopy machine operator. (Id.).

**E.    Lifestyle Evidence**

**1.  First Adult Function Report, August 30, 2011**

On August 30, 2011, Plaintiff submitted her first Adult Function Report. (R. 213-

22). In this report, Plaintiff states that she is unable to work because her "whole body

aches" and she is "always in horrible pain." (R. 213). Additionally, Plaintiff states that

she is unable to work because:

> I can't climb steps. I can't sit for long. I can't lay [too] long. [I] can't stand
> [too] long. My medications make me real tired and sleepy. [I] can't lift
> hardly anything . . . and I trip over everything because my eyes are so
> bad.

(Id.).

Plaintiff discloses that she is limited in some ways but not others. In several

activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to

perform her own personal care, prepare her own meals and perform household chores

such as washing laundry, washing dishes and straightening the house. (R. 216-17). She is able to operate a motor vehicle independently, although she requires accompaniment when leaving the house. (R. 218-19). She is able to shop in stores for groceries and necessities. (R. 218). She is able to pay bills, count change, handle a savings account and use a checkbook/money orders. (Id.). She is also able to handle changes to her routine, get along with authority figures and follow simple written and spoken instructions. (R. 220-21).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her physical and mental impairments. Regarding her physical impairments, Plaintiff's conditions affect her ability to, *inter alia*: lift, squat, bend, stand, reach, walk, sit, sleep, kneel, hear, climb stairs, see and use her hands. (R. 216, 220). Plaintiff estimates that she is limited to lifting five pounds if she is "lucky" and to walking "about half a block" before requiring a fifteen-minute rest. (R. 220). Due to these limitations, Plaintiff requires assistance vacuuming, sweeping, mopping and lifting/carrying her clothes basket. (R. 217). Regarding her mental impairments, Plaintiff's conditions affect her ability to handle stress, recall information, engage in social activities, complete tasks, concentrate, understand information and get along with others. (R. 217, 219-21).

Finally, Plaintiff details her routine activities. Each day, Plaintiff awakens and "tr[ies] to do what [she] can," including washing clothes, washing dishes, cleaning the house, cooking and showering. (R. 216). Occasionally, she goes on a walk outdoors. (R. 218). Every two weeks, she shops for groceries and necessities. (Id.).

### 2. Personal Pain Questionnaire, March 20, 2012

On March 20, 2012, Plaintiff submitted a Personal Pain Questionnaire. (R. 238-42). In this questionnaire, Plaintiff indicates that she suffers from pain in her back, left hip and entire body. (R. 238). Plaintiff characterizes her pain as aching, burning, stabbing and continuous in nature. (Id.). She states that cold weather, rain and physical activities aggravate her pain and that laying down alleviates the pain. (Id.). She further states that, while she takes Opana, Lortab, Lyrica and ibuprofen for her pain, her pain medications are "never" effective. (Id.).

### 3. Second Adult Function Report, March 20, 2012

On March 20, 2012, Plaintiff submitted her second Adult Function Report. (R. 230-37). In this report, Plaintiff states that she is unable to work due to her Grave's disease, diabetes mellitus, fibromyalgia, degenerative disc disease, GERD, arthritis, chronic fatigue, Baker's cyst, high cholesterol, high triglycerides and high blood pressure. (R. 237). Plaintiff further states that she is unable to work due to a lower back and left hip injury. (R. 230).

Plaintiff explains that she has become more limited in her physical and mental abilities since her last Adult Function Report. Regarding her physical abilities, Plaintiff's personal tasks "take[ ] a lot longer" to perform. (R. 231). She is no longer able to handle a savings account or perform housework, except for washing dishes and washing laundry. (R. 232-33). She is not able to perform yardwork, sit for longer than a half hour, lay down for longer than four hours or climb more than four to five stairs at a time. (R. 230-33). She is limited to walking a distance of 175 feet before requiring a "couple of hours" of rest. (R. 235). She also experiences difficulty cooking. (R. 231).

Despite her limitations, Plaintiff explains that she remains able to perform certain activities. For example, Plaintiff is able to perform her own personal care, operate a motor vehicle and shop in stores for groceries, although her daughter assists with Plaintiff's shopping. (R. 231, 233). She is able to prepare simple meals such as sandwiches and frozen dinners. (R. 232). She is able engage in social activities and get along with authority figures. (R. 234, 236). She is able to complete tasks and follow written and spoken instructions. (R. 235). She is also able to handle changes to her routine. (R. 236).

Finally, Plaintiff details her new routine activities. On a typical day, Plaintiff awakens, takes her medications[5] and showers. (R. 231). She then lays on her couch or sits in a recliner with her feet propped up and watches television. (Id.). If she is hungry, she fixes "something fast to eat." (Id.). At some point during the day, she washes her dishes. (R. 232). She no longer goes outside "very often." (R. 233). Once a week, Plaintiff washes laundry. (R. 232). On special occasions, she visits her children and grandchildren. (R. 234).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or
> impairments . . . of such severity that he is not only unable to do his

---

[5] On October 22, 2013, Plaintiff submitted a form entitled "Claimant's Medications." (R. 252). On this form, Plaintiff states that she is prescribed the following medications: (1) Synthroid for her thyroid/Grave's disease; (2) estradiol for hormone replacement therapy; (3) tizanidine for "muscle disease;" (4) Lasix for high blood pressure; (5) Lortab for chronic pain; (6) Klonopin for anxiety; (7) ibuprofen for pain/inflammation; (8) K-Dur for low potassium levels; (9) epinephrine for emergency allergic reactions; (10) Celexa for anxiety/depression; (11) Crestor for cholesterol; (12) Vitamin D3 for low Vitamin D levels and (13) aspirin for heart health. (Id.). In addition to these medications, Plaintiff is prescribed eyeglasses/contact lenses. (R. 221).

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses

the following five-step sequential evaluation process to determine whether a claimant is

disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the

claimant to prove that he or she is disabled and that, as a result of the disability, he or

she is unable to engage in any gainful employment. <u>Richardson v. Califano</u>, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. <u>Hicks v. Gardner</u>, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since June 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: lumbar strain/sprain; diagnosis of left SI joint dysfunction; diagnosis of fibromyalgia; and early degenerative changes of the left knee (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she should do minimal kneeling, crawling or squatting, and should never climb ladders, ropes or scaffolds. She should only occasionally climb ramps and stairs, balance and stoop. The claimant should avoid concentrated exposure to temperature extremes, wet or humid conditions, or environmental pollutants. She should avoid all exposure to hazards. The claimant should work in a low stress environment with no production line or

assembly line-type of pace, no independent decision-making responsibilities, and minimal changes in the daily work routine. She is limited to unskilled work involving only routine and repetitive instructions and tasks. She should have no interaction with the general public and no more than occasional interaction with co-workers and supervisors.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on May 20, 1964 and was 47 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 17-39).

## VI.    DISCUSSION

## A.    Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ improperly evaluated and weighed the medical opinions of Drs. Morrison and Goudy. (See Pl.'s Br. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 1,

ECF No. 11). Plaintiff requests that the Court remand the case for the calculation of benefits or, in the alternative, remand the case for further proceedings. (Pl.'s Mot at 1).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ appropriately assessed all of the medical opinions of record. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 9, ECF No. 15). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.      Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640,

642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.      Analysis of the Administrative Law Judge's Decision**

Plaintiff argues that the ALJ improperly evaluated and weighed the medical opinions of Drs. Morrison and Goudy. (See Pl.'s Br. at 1). Specifically, Plaintiff argues that the ALJ: (1) failed to correctly apply the "treating physician rule" when evaluating the medical opinion of Dr. Morrison and (2) improperly assigned "limited weight" to the medical opinion of Dr. Goudy. (See id.). Defendant argues that the ALJ properly evaluated and weighed both medical opinions. (Def.'s Br. at 9).

An ALJ must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When weighing and evaluating these opinions, an ALJ often accords "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the claimant and has a treatment relationship with the claimant. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." Anderson v. Comm'r, Soc. Sec., 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence," then it should not be accorded controlling weight. Id. Additionally, if a physician's opinion encroaches on an issue reserved to the Commissioner, including the issue of whether a claimant meets the statutory definition

of disability, then the opinion should not be accorded controlling weight. 20 C.F.R. §§ 404.1527(d)(3) & 416.927(d)(3).

When evaluating medical opinions that are not entitled to controlling weight, an ALJ must consider the factors detailed in 20 C.F.R. §§ 404.1527 and 416.927. 20 C.F.R. §§ 404.1527 & 416.927. These factors include: (1) whether the physician has examined the claimant; (2) the treatment relationship between the physician and the claimant, including the length of the treatment relationship and the frequency of examination; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist and (6) any other factor that tends to support or contradict the opinion. Id. An ALJ, however, need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." Fluharty v. Colvin, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015).

While an ALJ need not explicitly recount his or her analysis of the factors listed in 20 C.F.R. §§ 404.1527 and 416.927, an ALJ must "give 'good reasons' in the [written] decision for the weight ultimately allocated to medical source opinions." Id. (quoting 20 C.F.R. § 404.1527(d)(2)). In this regard, Social Security Ruling 96–2p provides that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Once an ALJ has determined "the weight to be assigned to a medical opinion[, that determination] generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies' or has failed to give a sufficient reason for the weight afforded a particular opinion." Dunn v. Colvin, 607 F. App'x. 264, 267 (4th Cir. 2015)

(internal citations omitted). With these rules in mind, the undersigned will examine the ALJ's treatment of Dr. Morrison's and Dr. Goudy's medical opinions.

### 1. Whether the ALJ Properly Applied the "Treating Physician Rule" When Evaluating the Medical Opinion of Dr. Morrison

The ALJ accorded "limited weight" to the opinion of Dr. Morrison contained in the Treating Source Statement dated October 30, 2012. (R. 33). Initially, the ALJ noted that Dr. Morrison concluded in the Treating Source Statement that Plaintiff: (1) would require a position change every thirty to forty-five minutes if she were to work and (2) "would have significant difficulty and pain . . . trying to sustain meaningful employment." (R. 32). The ALJ then declined to accord the opinion controlling weight, noting that both of Dr. Morrison's conclusions were "not consistent with the objective medical signs and findings in the record" and that his second conclusion was "on an issue reserved to the Commissioner." (R. 33). Subsequently, the ALJ reasoned that the opinion was entitled to only limited weight because:

> [Dr. Morrison's] opinion that [Plaintiff] would have significant difficulty sustaining meaningful employment is an opinion on an issue reserved to the Commissioner. While Dr. Morrison is [Plaintiff's] treating family doctor, he is not a specialist in neurology or rheumatology. He stated that [Plaintiff's] fibromyalgia tender points interfered with range of motion in her joints, although fibromyalgia is primarily a muscular disorder. In any event, however, his progress notes do not document the significant range of motion limitations he reported in this statement. For instance, in [Plaintiff's] last two office visits, Dr. Morrison reported that range of motion was normal throughout.

> While [Plaintiff] has reported significant pain, she has also indicated that her pain medications are effective in controlling the pain. She has noted significant medication side effects. Further, while Dr. Morrison reported that [Plaintiff] has exam findings consistent with lumbar nerve root compression, the undersigned notes that there are no MRI findings to substantiate this. MRI scans of the lumbar and thoracic spine performed in 2010 were normal. It is notable that Dr. Morrison has not referred [Plaintiff] to a pain clinic for epidural steroid injections or other typical treatments for

suspected lumbar nerve compression, nor has he referred her to a neurosurgeon for treatment. For these reasons, the undersigned has not given full weight to Dr. Morrison's opinion.

(Id.) (internal citations omitted).

The undersigned finds that the ALJ properly evaluated Dr. Morrison's opinion. The ALJ determined that Dr. Morrison's opinion was not entitled to controlling weight because, *inter alia*, it was not supported by the clinical medical evidence. The ALJ then proceeded to consider the five factors listed in 20 C.F.R. §§ 404.1527 and 416.927. While the ALJ did not explicitly recount the details of his analysis of the five factors in his written opinion, his consideration of the factors is obvious by his determinations that Dr. Morrison's opinion was not consistent with record and that Dr. Morrison is a family doctor, not a specialist[6] (factors four and five). Moreover, the ALJ provided his reasons for according the opinion limited weight, which are sufficiently specific. Therefore, the ALJ followed proper procedure when according Dr. Morrison's opinion limited weight.

Plaintiff argues that Dr. Morrison's opinion is entitled to controlling weight. (Pl.'s Br. at 6). Specifically, Plaintiff argues that the ALJ erred in determining that the opinion encroached on an issue reserved to the Commissioner because "Dr. Morrison did not opine that [Plaintiff] was 'disabled' or 'unable to work.'" (Id. at 9). "Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a

---

[6] Plaintiff argues that "Dr. Morrison is not required to be a [specialist for his opinion] . . . to be given controlling weight." (Pl.'s Br. at 10). However, the ALJ did not deny the opinion controlling weight because Dr. Morrison is not a specialist. (R. 33). Instead, the ALJ denied the opinion controlling weight because it was inconsistent with the record and because it encroached on an issue reserved to the Commissioner. (Id.). Once the ALJ decided that Dr. Morrison's opinion would not be controlling, the ALJ then evaluated the opinion using the five factors listed in 20 C.F.R. §§ 404.1527 and 416.927, one of which authorizes an ALJ to consider whether the physician is a specialist. (See id.).

case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527 & 416.927. Opinions that are reserved to the Commissioner include: (1) opinions that a claimant is "disabled" or "unable to work" and (2) "[o]ther opinions" that infringe on the ALJ's exclusive authority to make findings of fact and conclusions of law. Id.

In the present case, it is not clear whether Dr. Morrison's statement that Plaintiff "would have significant difficulty and pain in trying to sustain meaningful employment" qualifies as a medical opinion. Under the Social Security Act, "disabled" is defined in part as the inability to engage in substantial gainful activity by reason of a medically-determinable impairment. 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). While Dr. Morrison does not explicitly declare that Plaintiff's impairments prevent her from engaging in substantial gainful activity, his statement appears to intrude into the Commissioner's exclusive authority for determining whether a claimant is disabled. Additionally, Dr. Morrison's statement appears to intrude on the ALJ's exclusive authority to make findings of fact regarding the nature and severity of Plaintiff's impairments. Therefore, on the one hand, Dr. Morrison's statement appears to infringe on issues reserved to the Commissioner. However, on the other hand, Dr. Morrison's statement does not directly cross that line. Regardless, the undersigned finds that any error on the part of the ALJ is harmless in nature.[7] See Ngarurih v. Ashcroft, 371 F.3d

---

[7] Plaintiff contends that the undersigned is required to find that Dr. Morrison's opinion is "due special weight," citing to the case Morgan v. Barnhart, 142 F. App'x. 716 (4th Cir. 2005), an unpublished opinion. (Pl.'s Br. at 10). However, Plaintiff misstates the holding in Morgan. In Morgan, the Court stated that "[i]t is a close[ ] question whether Dr. Holford's fourth opinion— that 'it would be hard [for Morgan] to sit or stand for a 5 hour day'—is a medical opinion." Morgan, 142 F. App'x. at 722. Then, declining to decide the matter, the Court stated that, "[e]ven assuming . . . that this opinion is a medical opinion due special weight under the treating-physician rule, any error in failing to credit this opinion was harmless." Id. at 723.

182, 190 n.8 (4th Cir. 2004) (stating that "reversal [of an administrative decision] is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached"). The ALJ did not determine that Dr. Morrison's opinion was undeserving of controlling weight solely because he believed it infringed on an issue reserved to the Commissioner. Instead, the ALJ additionally reasoned that the opinion was undeserving of controlling weight because it was not supported by the clinical medical evidence, a line of reasoning that is supported by substantial evidence, as will be discussed below.

Plaintiff also argues that the ALJ erred in determining that Dr. Morrison's opinion is unsupported by the clinical medical evidence for several reasons. (Pl.'s Br. at 5-13). First, Plaintiff argues that "[t]he only evidence contradicting [the] opinion [came] from . . . [Dr. Franyutti], who did not examine [Plaintiff] and who, as a matter of law, is not substantial evidence in this situation." (Id. at 8). Plaintiff contends that the ALJ solely relied on Dr. Franyutti's opinion to discredit Dr. Morrison's opinion because the ALJ fully discounted Dr. Gomez's opinion, assigned limited weight to Dr. Morrison's opinion and failed to weigh Dr. Orvik's opinion and the opinions "from [other] physical-related doctors."[8] (Id. at 9). The undersigned finds that these arguments lack merit. The ALJ did

_____

[8] Despite Plaintiff's contentions, the ALJ evaluated all six of the medical opinions of record. The ALJ explicitly assigned Dr. Bartee's and Dr. Franyutti's opinions great weight and Dr. Morrison's and Dr. Goudy's opinions limited weight. (R. 33, 35, 38). As for Dr. Gomez's opinion, in which Dr. Gomez opined that Plaintiff does not suffer from a severe physical impairment, the ALJ clearly discounted the opinion and provided reasons for doing so. (R. 37). As a result, any error on the part of ALJ in failing to explicitly state the weight of Dr. Gomez's opinion is harmless in nature. See Spurlock v. Astrue, No. 3:12-CV-2062, 2013 WL 841474, at *20 (S.D. W. Va. Jan. 28, 2013) R&R adopted sub nom. Spurlock v. Asture, No. CIV.A. 3:12-2062, 2013 WL 841483 (S.D. W. Va. Mar. 6, 2013) (stating that "an ALJ's failure to explicitly state the weight he gave to a particular medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the decision and any grounds for [counting or] discounting it are reasonably articulated"). Finally, regarding the "opinion" of Dr. Orvik contained in his report of the Disability Determination Examination ("DDE") dated May 5, 2012, the ALJ

not use Dr. Franyutti's opinion to discredit Dr. Morrison's opinion. Instead, the ALJ used Dr. Franyutti's opinion to support her RFC determination.[9] (R. 38). Moreover, the ALJ explained in detail the evidence that contradicts Dr. Morrison's opinion. While Plaintiff may disagree with the ALJ's reasoning, the reasons are sufficiently specific to make clear the weight the ALJ assigned to Dr. Morrison's opinion, which was all that was required of him.

Second, Plaintiff argues that the ALJ erred in discrediting Dr. Morrison's statement that "[Plaintiff's] fibromyalgia tender points interfered with range of motion in her joints" by reasoning that "fibromyalgia is primarily a muscular disorder." (Pl.'s Br. at 11). Plaintiff contends that, in making this statement, the ALJ either improperly mischaracterized the evidence or "ma[de] his own medical determination." (Id.). The

---

noted that "Dr. Orvik did not [provide] an opinion on what [Plaintiff is] able to do in spite of her limitations" but instead "repeated [Plaintiff's] own report of her limitations." (R. 31). Therefore, while the ALJ thoroughly discussed Dr. Orvik's DDE, the ALJ did not evaluate and weigh Dr. Orvik's statements as a medical opinion. See 20 C.F.R. §§ 404.1527 & 416.927 (stating that ALJs will evaluate and weigh every "medical opinion" of record but defining the term as "statements from . . . acceptable medical sources that reflect *judgments* about the nature and severity of [claimants'] impairment(s), including . . . what [they] can still do . . . and [their] physical or mental restrictions") (emphasis added). Because Plaintiff fails to identify any statement of Dr. Orvik's that qualifies as a medical opinion and because treating Dr. Orvik's statements as a medical opinion would not alter the ultimate disability determination in this case, any error on the part of the ALJ in failing to treat Dr. Orvik's statements as a medical opinion is harmless in nature. See Norman v. Comm'r of Soc. Sec., No. 2:14-CV-33, 2014 WL 5365290, at *20 (N.D. W. Va. Oct. 21, 2014) (stating that, when an error is inconsequential to the ultimate disability determination, the error is harmless in nature).

[9] Although Plaintiff does not directly challenge the ALJ's RFC determination, the undersigned notes that the RFC determination is supported by substantial evidence. Contrary to Plaintiff's argument, the ALJ did not solely rely on Dr. Franyutti's opinion when formulating the RFC. Instead, the ALJ stated that he based the RFC determination on "the opinions of Dr. Franyutti and Dr. Bartee and the records of Dr. Morrison, Dr. Kafka, and Dr. Powelson." (R. 38). While Plaintiff contends that the opinions of non-examining state agency physicians cannot constitute substantial evidence, the ALJ could properly rely upon Drs. Franyutti's and Bartee's opinions because they are supported by the records of Drs. Morrison, Kafka and Powelson. Leonard v. Schweiker, 724 F.2d 1076, 1078 (4th Cir. 1983) (stating that, unless a non-examining physician's opinion "is contradicted by all of the other evidence in the record," an ALJ may use a non-examining physician's opinion as substantial evidence supporting a denial of disability).

undersigned finds little merit to this argument. Many courts have noted that fibromyalgia patients generally experience muscle and musculoskeletal pain but retain full range of motion of their joints. See, e.g., Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 244 (6th Cir. 2007) (stating that "fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion"); Green–Younger v. Barnhart, 335 F.3d 99, 108–09 (2d Cir. 2003) (stating that "we have recognized that '[i]n stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions'"); Russ v. Colvin, 67 F. Supp. 3d 1274, 1279 (D. Colo. 2014) (stating that the Tenth Circuit has recognized that "lack of medical testing and minimal objective medical findings are typical in fibromyalgia cases, and persons suffering from fibromyalgia often . . . have full range of motion").

Moreover, the ALJ did not discredit Dr. Morrison's statement solely because "fibromyalgia is primarily a muscular disorder." Instead, the ALJ additionally reasoned that, "[i]n any event, . . . [Dr. Morrison's own] progress notes do not document the significant range of motion limitations he reported in [his Treating Source Statement]. For instance in [Plaintiff's] last two office visits, Dr. Morrison reported that range of motion was normal throughout." (R. 33). While Plaintiff argues that the ALJ was engaging in his own medical analysis by making these statements, the ALJ was in reality attempting to resolve inconsistencies within the medical evidence, which properly falls under his role as ALJ. See Lee v. Astrue, No. 3:11-CV-00958, 2012 WL 6151178, at *10 (S.D. W. Va. Dec. 11, 2012) (stating that "[w]hen there are inconsistencies in the

record, the ALJ is charged with the duty of resolving the conflicts").

Third, Plaintiff argues that the ALJ erred in stating that Dr. Morrison's "progress notes do not document . . . significant range of motion limitations." (Pl.'s Br. at 12-13). Specifically, Plaintiff argues that the ALJ: (1) mischaracterized Dr. Morrison's opinion in making this statement and (2) supported the statement by cherry-picking progress notes from the record. (Id.). The undersigned finds that these arguments lack merit. Regarding Plaintiff's first contention, Dr. Morrison concluded in his opinion that the "[r]ange of motion in nearly all of [Plaintiff's] joints is limited by [her] pain." (R. 608). Then, instead of repeating this language verbatim, the ALJ stated that Dr. Morrison reported "significant range of motion limitations." (R. 33). This reiteration of Dr. Morrison's statement is reasonable and not a mischaracterization of the evidence. Regarding Plaintiff's second argument, an ALJ is "not obligated to comment on every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015). Instead, an ALJ need only "provide a minimal level of analysis that enables [a] reviewing court[] to track the ALJ's reasoning," which the ALJ supplied. McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015).

Fourth, Plaintiff argues that "[t]he ALJ committed a clear error of law by utilizing rescinded SSR 99-2p in finding that Dr. Morrison's opinion deserved limited weight."[10] (Pl.'s Br. at 12). The undersigned disagrees. The ALJ only cited SSR 99-2p in step

---

[10] Plaintiff states that "SSR 12-2p is now the relevant SSR on fibromyalgia." (Pl.'s Br. at 11). To the extent that Plaintiff is arguing that the ALJ should have cited to SSR 12-2p in his opinion, the undersigned finds the argument unpersuasive. While the ALJ may not have directly cited to SRR 12-2p, 2012 WL 3104869 (July 25, 2012), the ALJ followed the procedures set forth within it. Indeed, Plaintiff fails to specify any way in which the ALJ failed to abide by SSR 12-2p.

three of the sequential evaluation process to support his statement that fibromyalgia constitutes a medically determinable impairment even though it is not a listed impairment. (R. 23). Moreover, the ALJ's decision is dated March 27, 2014, and SSR 99-2p was not rescinded until April 3, 2014, as found on the Social Security Administration's website at https://www.ssa.gov/OP_Home/rulings/di/01/SSR99-02-di-01.html.[11] Consequently, the ALJ's assignment of "limited weight" to the opinion of Dr. Morrison is supported by substantial evidence.

### 2. Whether the ALJ Properly Accorded Proper Weight to the Medical Opinion of Dr. Goudy

The ALJ accorded "limited weight" to the opinion of Dr. Goudy contained in the Psychological Evaluation dated August 12, 2013. (R. 35). Initially, the ALJ noted that Dr. Goudy concluded in the Psychological Evaluation that Plaintiff possesses functional limitations, including "a mild to moderate impairment of activities of daily living (particularly regarding activities outside of the home), a moderate impairment in social functioning, a marked impairment of concentration, persistence and pace and no episodes of decompensation that [are] of extended duration."[12] (Id.).The ALJ further noted that Dr. Goudy concluded that Plaintiff "would have significant difficulty returning

---

[11] Plaintiff argues that, assuming the ALJ's "usage [of SSR 99-2p] was harmless error, the ALJ still did not account for the pain associated with [Plaintiff's] fibromyalgia [in the RFC]." (Pl.'s Resp. at 8-9). The undersigned disagrees. The ALJ specifically stated that he "considered [Plaintiff's] fibromyalgia symptoms, including pain and fatigue . . . in determining [her] maximum [RFC]." (R. 23). However, the ALJ found that Plaintiff was "not entirely credible" regarding the intensity, persistence and limiting effects of her pain and other symptoms, a finding that Plaintiff does not contest. (R. 35).

[12] Defendant argues that "the ALJ accounted for Dr. Goudy's limitations when preparing [the mental] RFC." (Def.'s Br. at 15). Plaintiff then argues that, "if . . . Defendant is correct and the ALJ did account for Dr. Goudy's limitations, then the ALJ did not explain why or how [Plaintiff's] 'marked impairment' in concentration was factored into the RFC." (Pl.'s Resp. at 6). Despite these arguments, the ALJ did not account for Dr. Goudy's limitations in the RFC. Instead, the ALJ specifically stated that he based the RFC determination on "the opinions of Dr. Franyutti and Dr. Bartee and the records of Dr. Morrison, Dr. Kafka, and Dr. Powelson," not on Dr. Goudy's opinion. (R. 38).

to work" and that her "prognosis . . . to successfully pursue substantial gainful activity is poor." (Id.). Subsequently, the ALJ reasoned that the opinion was entitled to only limited weight because:

> While [Dr. Goudy] is a specialist in psychology, he only evaluated [Plaintiff] on one occasion, and his opinion is not fully consistent with the other evidence of record. For instance, Dr. Morrison consistently noted in his progress notes that [Plaintiff's] mood, affect, memory and judgment were normal. He never referred [Plaintiff] to a mental health specialist, which would be expected if [Plaintiff's] symptoms were as severe as she reported to Dr. Goudy. On July 24, 2013, only a few weeks prior to seeing Dr. Goudy, [Plaintiff] told Dr. Morrison that she had stayed busy around the house and visiting her grandchildren. This is inconsistent with her report to Dr. Goudy that she had lost interest in most things and did not leave the house very much. Further, while she reported weight fluctuations due to appetite problems to Dr. Goudy, Dr. Morrison's records do not reflect any significant fluctuations. Therefore, the undersigned has not given significant weight to Dr. Goudy's opinion.

(Id.) (internal citations omitted).

The undersigned finds that the ALJ properly evaluated Dr. Goudy's opinion. The ALJ determined that Dr. Goudy's opinion was not entitled to controlling weight because it was not supported by the clinical evidence of record. The ALJ then proceeded to consider the five factors listed in 20 C.F.R. §§ 404.1527 and 416.927. While the ALJ did not explicitly recount the details of his analysis of the five factors in his written opinion, his consideration of the factors is obvious by his findings that Dr. Goudy is a specialist in psychology, Dr. Goudy only examined Plaintiff on one occasion and the opinion was not fully consistent with the record (factors two, four and five). Moreover, the ALJ provided his reasons for according the opinion limited weight, which were sufficiently specific. The ALJ thus followed proper procedure when according Dr. Goudy's opinion limited weight.

Plaintiff argues that the ALJ erred in using Dr. Morrison's opinion to discount Dr.

Goudy's opinion. (See Pl.'s Br. at 13-15). Specifically, Plaintiff argues that the ALJ acted arbitrarily and unreasonably when he assigned limited weight to Dr. Morrison's opinion yet deemed it credible enough to discount Dr. Goudy's opinion. (Id. at 13). The undersigned finds that Plaintiff's argument lacks merit. The ALJ did not use the *medical opinions* contained in Dr. Morrison's Treating Source Statement to discount the opinion of Dr. Goudy. See 20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2) (defining "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect *judgments* about the nature and severity of [claimants'] impairment(s), including [their] symptoms, diagnosis and prognosis, what [they] can still do despite impairment(s), and [their] physical or mental restrictions") (emphasis added). Instead, the ALJ referred to Dr. Morrison's *treatment notes*, which detailed Dr. Morrison's observations and treatment of Plaintiff. Therefore, contrary to Plaintiff's argument, the ALJ did not use Dr. Morrison's opinion to discredit Dr. Goudy's opinion.[13]

Similarly, Plaintiff further argues that the ALJ erred in discrediting Dr. Goudy's opinion "based on [the] gratuitous observations of [a] treating physician who had no training in the discipline of mental impairments." (Pl.'s Br. at 14). The undersigned disagrees. Dr. Goudy's opinion was not automatically entitled to great weight simply because he is a specialist. See 20 C.F.R. §§ 404.1527(c)(5) & 416.927(c)(5) (stating that, while ALJs "generally give more weight to the opinion of a specialist about medical

---

[13] Plaintiff appears to use the terms "medical opinion" and "treatment notes" interchangeably. (Pl.'s Br. at 14). To illustrate, Plaintiff states in some parts of her brief that the ALJ acted arbitrarily in his treatment of Dr. Morrison's *medical opinion* while stating that the ALJ arbitrarily treated Dr. Morrison's *treatment notes* in other parts of her brief. (Id.). When the ALJ assigned limited weight to Dr. Morrison's medical opinion, however, he did not discredit Dr. Morrison's treatment notes. Instead, Dr. Morrison's treatment notes are part of the record that the ALJ was authorized to consider when evaluating each of the medical opinions of record. See 20 C.F.R. §§ 404.1527(c) & 416.927(c).

issues related to his or area of specialty than to the opinion of a source who is not a specialist," an ALJ is not required to do so). Instead, an ALJ must consider the five factors listed in 20 C.F.R. §§ 404.1527 and 416.927 when evaluating a specialist's opinion, which the ALJ did in this case. 20 C.F.R. §§ 404.1527(c) & 416.927(c) (listing as one factor the consistency of the opinion with the record, which includes treatment notes detailing the claimant's medical history). While Plaintiff argues that Dr. Morrison, Plaintiff's treating physician, was not trained in psychology, Dr. Morrison's treatment notes reflect only his general observations and treatment plan, which are well within his knowledge and expertise. Moreover, Plaintiff cites to no binding case law to support her contention that the ALJ could not use Dr. Morrison's treatment notes to discredit Dr. Goudy's opinion. Consequently, the ALJ did not err in his treatment of Dr. Goudy's opinion and the ALJ's assignment of "limited weight" to the opinion is supported by substantial evidence.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB and SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are

made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 10th day of May, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE